UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * * *
                                      *
KHIA HOLLYER                          *
                                      *
                Plaintiff,            *
                                      *  1:20-cv-954-SE
            v.                        *  September 22, 2022
                                      *  9:59 a.m.
TRUSTEES OF DARTMOUTH COLLEGE         *
                                      *
                Defendant.            *
                                      *
                                      *
* * * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL DAY THREE
MORNING SESSION
BEFORE THE HONORABLE SAMANTHA D. ELLIOTT

Appearances:

| | |
|---|---|
| For the Plaintiff: | John L. Ward, Esq.<br>Ward Law Group, PLLC<br><br>Jason R.L. Major, Esq.<br>Lehmann Major List, PLLC |
| For the Defendant: | Donald L. Smith, Esq.<br>Pierre A. Chabot, Esq.<br>Devine, Millimet & Branch, P.A. |
| Court Reporter: | Liza W. Dubois, RMR, CRR<br>Official Court Reporter<br>U.S. District Court<br>55 Pleasant Street<br>Concord, New Hampshire 03301<br>(603) 225-1442 |

I N D E X

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **MARK KULBIS** | | | | |
| By Mr. Smith | 7 | | 31 | |
| By Mr. Major | | 22 | | |
| **NATALIE KAMERER** | | | | |
| By Mr. Smith | 33 | | | |
| By Mr. Major | | 48 | | |
| **MEREDITH COCKERELL** | | | | |
| By Mr. Smith | 63 | | 80 | |
| By Mr. Major | | 75 | | |

| EXHIBITS: | FOR ID | IN EVD. |
|---|---|---|
| (None marked.) | | |

P R O C E E D I N G S

WITHOUT THE JURY PRESENT

THE COURT: I just wanted to touch base about where we are. First things first.

We -- one of our jurors is sick. Juror number 2 called in sick. He does not have COVID, but he's not going to be able to make it today. So, as you know, we built in some buffer in the jury, so we're going to proceed without him. He's excused from the rest of the trial.

Second thing is I did receive an email from plaintiff's counsel, thank you, and I just wanted to clarify. So those are the documents that you received last week; is that correct, Attorney Ward?

THE PARALEGAL: No, the -- sorry. I apologize.

THE COURT: That's okay.

THE PARALEGAL: The document you received yesterday was the one I received last week. The ones that I emailed today, last night, are the ones we received last night.

THE COURT: Okay. And so do we have a handle on whether there are other providers and other medical documents that are outstanding?

MR. WARD: It's my understanding, we spoke with Bee yesterday, that this is all the treatment, every provider. There's some PT and then what we sent you, the therapy.

THE COURT: Did we -- I'm sorry. Did we get all of

the documents from the therapy or just a list of documents?

THE CLERK: Everything.

THE COURT: Okay. You think we have everything?

MR. WARD: These are the records I think taken directly from her portal.

THE COURT: Okay.

THE CLERK: I have everything they sent --

THE COURT: But --

THE CLERK: -- except for the ones they sent me yesterday. I forwarded those to counsel.

THE COURT: Okay.

THE CLERK: I can forward -- I think I forwarded you --

THE LAW CLERK: Yeah, you did. I just want to make sure those are all the documents themselves plus the list of documents.

THE CLERK: Yeah, it's everything I received from them.

THE COURT: Okay. All right. Okay. So that's where we're at. We're still going to proceed with the trial.

And jury instructions. We're hoping that we're going to get them to you at the end of lunch. You're going to see in it probably that there are a couple places where there are things in bold because they're instructions that'll only be necessary depending on how evidence comes in. So we figured

we'll give you the language now and then if we need them, they're ready, and if we don't need them, we'll take them out. But that's it for that.

Any other issues that cropped up overnight or anything we need to be concerned about?

Witness scheduling is okay?

MR. SMITH:  Yup, we're good with witnesses on our side.

MR. WARD:  Yeah, I think we're good.

THE COURT:  Okay.  So what we're looking at today is we're going to start with Kulbis?

MR. SMITH:  Correct, your Honor.

THE COURT:  Okay.  And then Kamerer.

MR. SMITH:  Correct.

THE COURT:  And Cockerell.

MR. SMITH:  Correct.

THE COURT:  And then we are going to shoot for getting all of them done pretty quickly because we've got Goumas at 2:00.

MR. SMITH:  Yes.

THE COURT:  Okay.  If we get you the jury instructions, what that means is -- we've got Dr. Alexander tomorrow morning at 9:00 a.m., so we're probably looking at an early morning conference tomorrow to try to get through the jury instructions because we need to get them done so they're

ready to instruct the jury after Dr. Alexander and closing arguments.

Does anybody have any issues with getting -- with coming in to do that before 9:00 a.m. tomorrow?

MR. WARD:  No.

MR. MAJOR:  No.

MR. SMITH:  We don't think we'll have -- we don't have an issue.  One of us will be here, or both of us, just depending on the --

THE COURT:  Okay.  I mean, I'd be happy to stay late tonight, but you won't get -- I'm worried you won't have time to go through them and do your analysis.

MR. SMITH:  Yes, tomorrow morning is fine.

THE COURT:  Okay.  If there's nothing -- is there anything else?

MR. WARD:  No.

THE COURT:  All right.  Go ahead and bring in the jury.

                    WITH THE JURY PRESENT

THE CLERK:  Please be seated.

THE COURT:  Good morning, everybody.  Thank you for coming in in the storm this morning.  Appreciate it.

As I reminded you last night and continue to emphasize to you today, it is important that you decide this case based solely on the evidence and the law presented here.

So you must not learn any additional information about the case from sources outside the courtroom. To ensure fairness to all parties in the trial, I will now ask each of you whether you have learned about or shared any information about this case outside of the courtroom, even if it was accidental.

(Negative response from jurors.)

THE COURT: Okay. Thank you.

Counsel.

MR. SMITH: The defense calls Mark Kulbis as their next witness.

THE CLERK: Good morning.

THE WITNESS: Good morning.

THE CLERK: Just step around the witness box and raise your right hand.

**MARK KULBIS,** having been first duly sworn, testified as follows:

THE CLERK: Thank you. Would you please state your name and spell your last name for the record.

THE WITNESS: Mark Kulbis, K-u-l-b-i-s.

THE CLERK: Thank you. You may be seated.

DIRECT EXAMINATION

BY MR. SMITH:

Q. Good morning, Mr. Kulbis. Could you please briefly describe your educational background?

A. Yes. I have an undergraduate degree in exercise

science that I attained from Bowling Green State University and I have a master's in human health and performance that I attained at Austin Peay State University.

Q. And what year did you graduate from Bowling Green?

A. 2013.

Q. And how about from Austin Peay?

A. 2015.

Q. And could you just briefly describe for the jury the types of things that you study with your undergraduate degree in exercise science and the master's degree in human health and performance?

A. Yes. So the coursework is anything from sports psychology, nutrition coursework, human anatomy as well as physiology classes, how the body responds to exercise, how you train different populations, whether that's individuals with disabilities, a normal population, or athletic team individuals.

Q. And does that coursework include designing and implementing weight training?

A. Yes.

Q. And are you currently employed?

A. Yes.

Q. And where are you employed?

A. I work at Bucknell University and I am the head football strength and conditioning coach.

Q. And could you just briefly describe what a strength and conditioning coach is?

A. Yup. So a strength and conditioning coach is in charge of all facets of performance for whatever team that you work with. So that's flexibility, that's hitting on nutrition, developing an all-around athlete, whether that's in the weight room, on the field with conditioning, speed development, agilities, everything related to their sport performance.

Q. And could you briefly describe your experiences as a strength and conditioning coach since graduating from Bowling Green?

A. Yup. So I graduated in 2013. From there I went on to complete a football-only strength and conditioning internship at Notre Dame College of Ohio.

From there I went to Austin Peay State University and earned my master's as a strength and conditioning graduate assistant, so I was coaching while earning my master's.

And then from there I went to Ohio State. I worked with football only in strength and conditioning and then went to Dartmouth as a paid intern. I climbed the ladder there, I was promoted to an assistant strength and conditioning coach, and then I left as the associate director.

And then I was fortunate to get the job at Bucknell as the head football strength coach.

Q. When did you start your position at Bucknell?

A.	2016.

Q.	At Bucknell, I'm sorry.

A.	Oh, 2019.

Q.	Thank you.  And do you hold any certifications relating to strength and conditioning?

A.	Yes.  So I hold the CSCS, which is put out by the National Strength and Conditioning Association.  That's the gold standard in sports performance.  That is -- by legislation, by law, you have to have that as an NCAA strength and conditioning coach.  I have the USA Level 1, which goes along with teaching Olympic-level movements.  I'm functional range conditioning certified, functional movement screening, reflexive performance reset, and I am working on my precision nutrition certification currently.

Q.	Okay.  And the -- the CSCS, what do you have to do to earn that, the certified strength and conditioning specialist?

A.	Yup.  So I was first certified in 2014.  Every three years there is a -- you have to re-, basically, certify so there's a certain amount of continuing education units that you must have to have that recertification and I've held that and recertified that since 2014.

Q.	And I think you mentioned Level 1 USA weightlifting; is that correct?

A.	Yes.

Q.    When did you get that?

A.    That would have been in 2016.

Q.    And when you were at Dartmouth College, what coaches or what sports did you serve as the strength and conditioning coach for?

A.    Yup.  So I assisted with football, I worked with women's basketball, men's lacrosse, field hockey, squash, golf, and equestrian.

Q.    And am I correct that you were the field hockey strength and conditioning coach at Dartmouth College in December of 2017?

A.    Yes, correct.

Q.    And can you just please generally describe to the jury your responsibilities as a strength and conditioning coach for the field hockey team in 2017?

A.    Yup.  So I was responsible for designing any of the weight training programs, any of the conditioning work that we did, and the agilities as well as taking the teams through flexibility, mobility stretching, and things of that nature.

Q.    And when you say the design of the workout, can you explain how you would do that and how you would get the workouts to the athletes?

A.    Yup.  So we used a software at Dartmouth called TeamBuildr.  So basically that's on the iPads for our athletes. Every athlete has their own profile.  They log in, get on to

their profile, and all of the exercises that we are doing we track, so it goes from the A block and B block, C block, whatever we have going on, and basically they -- I input the exercises.

Q. Do you input anything other than the exercises?

A. Yes. So I also control the sets and the reps. And that is what I input.

Q. Okay. And does the athlete input anything into that system?

A. Yes. So the athlete inputs whatever weight that they used for that set into the software.

Q. And when you do the exercises, are they in a particular order?

A. Yes, they are in the order that I put them in.

Q. Okay. And is that the order that you expect the athlete to perform them in?

A. Yes.

Q. Okay. And did all of the field hockey athletes at Dartmouth College participate in the strength and conditioning program?

A. Yes.

Q. And was there any difference in the way that you handled the training for the upperclassmen athletes as opposed to the freshmen athletes?

A. Yes. So the upperclassmen would have worked with me

for at least a year, so they have their form and things like that down where I am comfortable with them kind of doing it on their own.

The freshmen, I teach them everything from the ground up. So that is a lot of demonstration on my end. That's a lot of technique and cueing.

Q. And when you say the upperclassmen were somewhat on their own, were you still present throughout the entire workout?

A. Yes.

Q. So when you were training freshmen, did it make a difference to you what lifting experience they had prior to coming into the weight room?

A. No.

Q. And why not?

A. Because I'm not exactly sure what they know. So you could have a strength and conditioning coach in high school that taught you bad habits, in my opinion, and I want to make sure we start off all on the ground level.

Q. Okay. And was there any kind of a general process that you would follow when introducing athletes to a new lift, a lift you hadn't coached them in before?

A. Yes. So I would gather everybody round, I would have them stand from front on, from side on, to see me complete reps so that they could get a perspective and see where the

body aligns.  And then that's a lot of cueing.  I literally demonstrate the rep.  I cue the rep, tell them exactly what I'm looking for, just to make sure we're all on the same page.

Q.   And when you were doing a lift that required you to add any weight, how would you make a determination of how much to start a freshman athlete at the first time that they're doing the lift?

A.   Yup.  So just what I look for when selecting a weight is just an adequate teaching weight in my experience, just making sure we have a submaximal weight on.

Q.   And as far as the group of freshmen, would they typically work out as a group?

A.   Yes.

Q.   Okay.  Did that ever vary?  Were there times that they didn't work out as a group?

A.   The only instance I could think of is if there is a class conflict.

Q.   Okay.  And what would happen then if there was a new lift to be introduced to an athlete and they hadn't been able to lift with the freshman group?

A.   I would treat it the same exact way; cue it, demonstrate it, coach it up.

Q.   Okay.  Are you familiar with the plaintiff, Khia Hollyer?

A.   Yes.

Q.   And how do you know Ms. Hollyer?

A.   She was a member of the field hockey team at Dartmouth.

Q.   Was that in 2017?

A.   Yes.

Q.   And you're aware in this case that Ms. Hollyer's claiming that she injured her lower back doing the hex bar dead lift?

A.   Yes.

Q.   Are you familiar with this type of lift?

A.   Yes.

Q.   So could you just briefly describe for the jury how that lift is performed, what the proper technique is for the hex bar dead lift?

A.   Yes.  So what I do, I step into the bar, I'm going to hit from the ground up.  So it's going to be feet are directly hip width.  You squat down to the bar, your chest is up, your shoulders are back, and your butt is down.  That's going to maintain a nice straight spine.

Q.   Okay.  And then what would they do after they have all of that?

A.   Yup.  So maintaining tightness in their upper back, they lift the weight up off the ground and then they control it back to the ground, completing the rep.

Q.   Okay.  And when -- before they start the lift, would

you go over all of that with them?

A.   Yes.

Q.   And how would you describe the -- the hex bar dead lift as far as being an upper body, lower body, or some other part of the body lift?

A.   I classify that as a lower body lift.

Q.   And why is that?

A.   Because the -- the majority -- the major muscle groups used are the glutes, the hamstrings, and the low back.

Q.   Okay.  And is this a common lift that most athletes do in your experience in a strength and conditioning program?

A.   Yes.

Q.   And why is that?

A.   It is the most fundamental version of a dead lift. It puts your body in the most mechanically advantageous position and it is the safest version.  You step into the bar so that you are the center of mass as opposed to a conventional dead lift where you -- that's just not the case.

Q.   And when you say a conventional dead lift, what do you mean?

A.   Basically a straight bar dead lift, so the bar's actually out in front of you.

Q.   And as far as the hex bar dead lift, would you characterize that more as an introductory lift, an advanced lift, somewhere in between?

A.    Introductory.

Q.    And why would you call it an introductory lift?

A.    Again, it's the easiest dead lift to perform.

Q.    Okay.  I'm just going to ask you a few questions about the -- the date of the lift in question on September 19th, 2017.

Do you recall that lifting session involving Ms. Hollyer?

A.    I don't really recall.

Q.    Okay.  Do you have any recollection of her reporting that she was injured on that day?

A.    I don't recall.

Q.    Do you recall what instructions you gave her that day?

A.    I don't recall, but going with instructions that I would typically provide for a dead lift, it would have been the same exact thing; cueing, demonstrating the movement, and just coaching it up.

Q.    Do you know how much weight Ms. Hollyer started with on that date?

A.    I don't recall.

Q.    Okay.  If Ms. Hollyer's claiming that it was 105 pounds that was on the bar, would you have any reason to question that?

A.    No.

Q.   And in your experience and with your education, would you -- would 105 pounds be an unusual amount of weight to start with for a field hockey player doing that lift for the first time?

A.   No.

Q.   And why not?

A.   As a Division I athlete, in my experience training female athletes, that is a very submaximal load on the bar.

Q.   And what kind of activities do you understand that field hockey engages in when they're practicing?  What kind of movements do they need to do?

A.   Yup.  So field hockey, you're basically bent over the whole time.  Obviously it's a shorter stick, you're sprinting, you're changing direction.  It is a very intensive sport.

Q.   Okay.  A lot of work on the lower body; is that fair to say?

A.   Yes.

Q.   Do you know what weight the -- or, actually, strike that question.

Do you know what weight the other freshman field hockey players started with when they did the hex bar dead lift in September 19th, 2017?

A.   105 pounds.

Q.   Okay.  And how do you know that?

A.   From the TeamBuildr workouts.

Q.   Okay.  So you've had an opportunity to look back at their workouts?

A.   Yes.

Q.   And do you know if any of the other freshman athletes were injured on the date in question doing the hex bar dead lift?

A.   Not that I'm aware of.

Q.   I'm going to show you a document right now and ask you some questions about it.

Can we put up Exhibit Number 30?

So this is a document that I'll represent to you is a note from Nico Berg, who is a physical therapist.  Do you recall receiving this document in or about September 2017?

A.   I do not.

Q.   Okay.  Is it possible that you received it and you just don't recall?

A.   That could be possible.

Q.   Okay.  And I'd ask that you review that note and just read through it.  Let me know when you've had a chance to read through it today.

A.   Yup.

Q.   Okay.  And in reviewing this note, if you had read it in September 2017, would that in any way impact your opinion on whether it was appropriate to have Ms. Hollyer perform the

hex bar dead lift?

A.    No, it would not.

Q.    Okay.  And why not?

A.    Because it says any heavy or overhead strength conditioning and I do not classify the trap bar dead lift as -- it's not an overhead movement and it was not heavy.

Q.    Okay.  And further up in it it says overhead.  It says cross-training that involves overhead movements or heavy upper body loading has created flare-ups and issues.

Would you consider the hex bar dead lift to be an overhead movement?

A.    No.

Q.    What would you understand an overhead movement to involve?

A.    Anything pressing above the head.

Q.    And the next -- it says or upper heavy body loading.  Would you consider the hex bar dead lift to be upper heavy body loading?

A.    No.

Q.    Okay.  Would you consider 105 pounds to be heavy?

A.    No.

Q.    And the note also indicates that she's able to complete in field hockey training without difficulty.

Does that tell you anything as a strength and conditioning coach?

A. She's healthy enough to play her sport, so in my opinion, I would think it's minor what's going on.

Q. During the course of Ms. Hollyer's testimony, she indicated that you gave her an instruction while doing the hex bar dead lift while she was lowering the bar to squat lower. Is that a cue or an instruction that you typically use when doing the hex bar dead lift?

A. Yes.

Q. Okay. Is that a cue or instruction that you're aware of other strength and conditioning coaches using?

A. Yes.

Q. And what does that mean when you say to squat lower?

A. To squat lower to allow the bar to touch the ground. So if you squat lower, your spine is -- sorry -- your spine is more upright, so protecting your low back.

Q. Okay. Mr. Kulbis, have you ever been injured performing lifts?

A. Yes.

Q. Okay. Can you tell the jury about that?

A. Yup. So I was squatting during my time at Dartmouth. I had 405 pounds on the bar, which was not a maximal load for me at the time. And I actually had three disc herniations occur while I racked the bar. So it wasn't in the process of squatting; it was actually putting the bar in the rack.

But it just goes to show that training, there's always a risk for injury. No matter how much you know, you know, what -- how much your education is, what your certifications is, there's always an inherent risk of injury while training.

MR. SMITH: Thank you. I have no further questions.

CROSS-EXAMINATION

BY MR. MAJOR:

Q. Good morning, Mr. Kulbis.

A. Good morning.

Q. We met some months ago via Zoom?

A. Yup.

Q. I'll just remind you, my name's Jason Major. I represent Khia Hollyer.

Just going back to that note from Nico Berg, can we put that up? It's Exhibit 30, I believe.

THE PARALEGAL: Bear with me. Sorry. Sorry. It's not --

MR. MAJOR: We'll try to proceed without it. See if you can fix that.

Q. Do you recall what the note said generally?

A. The one that was just up here?

Q. The note from the physiotherapist.

A. Yes.

Q. Okay. If you recall, it talked about heavy overhead

lifting?

A.   Yes.

Q.   And you're not sure if you received that note; is that your testimony?

A.   Yes.

Q.   Okay.  If you had received the note and were aware of its contents, would you have Bee doing overhead lifting of any sort?

A.   No.

Q.   All right.  Well, I need to -- the note exhibit, so bear with us.

Actually, Stacey, if you can put up Defense Exhibit A.

THE PARALEGAL:  Defense Exhibit A.

MR. MAJOR:  And if you can scroll down to September 19th.

Q.   Just going down to the fourth row, seated DB shoulder press, can you explain for us what that movement is?

A.   Yup.  So you'd be sitting down pressing dumbbells overhead.

Q.   Can you actually show us what that motion looks like?

A.   (Indicating.)

Q.   Straight up, right?  Is that considered an overhead lift?

A.   Yes.

Q.   So does that support the idea that you did not receive the note from Meredith Cockerell?

A.   Yes.

Q.   All right.  Thank you.

And you said that you generally don't inquire about athletes' lifting experience, correct?

A.   Yes.

Q.   And is that basically Dartmouth policy to not do that or a decision you made?

A.   I don't see the need, because I start everybody from the ground up.

Q.   You also explained how you show athletes the form and movement for each lift when you're doing that.  Do you explain the risk factors if they get it wrong?

A.   I coach up the form, you know, I demonstrate the movement.  I'm big on safety.  You know, coaching goes along with that.  But for every single movement that I coach, I don't say this is the risk of this bench press, this is the risk of this dumbbell row, you know.

Q.   Okay.  Something like a bench press, the risk is obvious.  If you drop the bar, you're going to get crushed, right?  Something like a squat or a dead lift, though, the risk is maybe a little bit less easy for a new person who's into weightlifting to understand.  Would you agree with that?

A.    I think the hex bar dead lift is very elementary and fundamental.  It's the -- the bar moves a foot and a half off the ground, depending on the limb length through individuals.

Q.    Would you agree that there are risks to the hex bar dead lift if you do it wrong?

A.    Yes, there is risk to any exercise if done wrong.

Q.    But there are particular risks to that lift?

A.    Yes.

Q.    And one of those risks is if you lower your upper body and raise your hips, it puts a lot of pressure on your lower spine, doesn't it?

A.    If the movement is done wrong, yes.

Q.    Or if you round your back, that also puts a lot of pressure on your lower spine.

A.    Yes.  If the movement's done wrong, it's --

Q.    You don't explain that to the athletes -- you show them the form, but you don't say, look, if you don't keep that back straight, you're going to injure your lower back?

A.    Again, I -- I coach it up and cue it to the best of my ability, you know, and I demonstrate the movement, making sure everybody's efficient.  And if somebody is not efficient in a movement, they will regress and they'll do less weight or they will do a different version or I will have them not do it.

Q.    Okay.  And we've heard that you don't think 105 pounds is a significant amount of weight.  But if it is for

a particular person and they're in the middle of the lift and they do it wrong, I understand you'd say -- you know, you'd cue them, you'd regress them, you'd try to get them to stop doing it; but if it's a significant amount of weight for that person by the time you do that, isn't it possible they're already going to be injured?

A.    Can you repeat the question?

Q.    Again, just if it's a significant amount of weight for that person and you're looking for problems with the lift and you're going to either cue them or regress them, that's the word you used, if that weight's significant for them, by the time you do that, it's possible they'd already have injured themselves, right?

A.    Again, I just -- I coach everything up, you know. It is a very submaximal load on the bar for a Division I female athlete, especially one with the athletic attributes that field hockey requires.

Q.    So a lot of assumptions are being made about what people should be able to do as opposed to what each individual actually can do; is that fair to say?

A.    Again, I -- I just -- I think as a Division I female athlete, 105 pounds on a trap bar dead lift, you know, if you cannot complete that, chances are you should not be playing, you know, college sports with all the sprinting and the training you've done, the practices you've done.

Q.   All right.  You know what a weight belt is, right?

A.   Yes.

Q.   Can you explain for us what a weightlifting belt is?

A.   Yup.  So it is a thick belt, usually five inches in width, that you would place around your low back.

Q.   And what's the purpose?

A.   The correct usage of a weight belt is to push out your stomach to brace the core.  A lot of people use them wrong, but you basically create a pressurized cylinder within the core by using that, just allowing -- it's basically to allow your core to brace harder.  It's not necessarily to -- a lot of people just put it on and they're relaxed.  That's not going to do anything.  Right?  You have to physically brace the core against that to create stiffness in that, in the core.

Q.   Okay.  And if you do that, if you use the belt right, it does two things; one is it makes the lift safer and, two, it makes the lift more efficient, correct?

A.   Yes.

Q.   And Dartmouth doesn't issue weight belts to its athletes?

A.   Dartmouth has belts, but, again, I don't think this is a load that requires belting.  If you belt early on with submaximal loads, it can actually cause weakness.

Q.   You know what a treatise is?

A.   What was that?

Q. Do you know what the word treatise means?

A. Treatise?

Q. How about we just use a book or a manual written by an authority on a subject.

A. Yup.

Q. Okay. I assume in your training you've read lots of books and manuals about weightlifting.

A. Yes.

Q. All right. And would you agree that virtually all of those books and manuals suggest that an athlete should be able to demonstrate the proper form for a lift with either no weight or minimal weight before attempting to lift any significant weight?

A. Yes.

Q. It sounded to me like you didn't really recall much about the particular day in question, September 19, 2017. Would it be fair to say that it was unlikely that Bee was given any opportunity to demonstrate proper form with a relatively unloaded bar?

A. I mean, looking at the records, everybody started at 105 pounds.

MR. MAJOR: Okay. And, Stacey, if you can put the Nico Berg note back up. It's Exhibit 30.

THE PARALEGAL: My monitor is off again.

MR. MAJOR: More technical issues.

THE PARALEGAL: My monitor is not working again.

THE CLERK: Okay.

MR. MAJOR: There we go.

Q. Do you see that, Mr. Kulbis?

A. Yes. Yes, I can see it.

MR. MAJOR: Okay. If you can just scroll down. That's good. Thank you.

Q. I think I heard you say on direct that you don't consider the dead lift an upper body motion, correct?

A. Yes, correct.

Q. All right. It's a lower body workout?

A. Yes.

Q. That includes the lumbar spine?

A. Yes.

Q. All right. And how does that weight get to the lumbar spine?

A. So if you perform the movement incorrectly, it'll -- you'll have more weight on your lumbar spine.

Q. All right. But the weight doesn't -- it's not attached to your hips or to your back; it has to get to your lower back through your hands, right?

A. Yes, correct.

Q. And that weight is first taken up by your hands and then it goes up your shoulders?

A. Yes, correct.

Q. And then basically across your shoulders to your spine, down to the lumbar spine?

A. Yes, the hands are the connecting point of the movement.

Q. All right. So any consideration given to the idea that if she has upper body weakness that that might impact her ability to do that lower body exercise?

A. No.

Q. Do you think it would have been important for you to know about the note from Nico Berg?

A. Yeah. I mean, it's --

Q. It would have been helpful to know that?

A. Yes.

Q. And one other question, did you ever ask any of the athletes if they had injuries before starting to lift with them?

A. No. So that's communicated by sports medicine staff, so typically I would never see a note like this. Again, I'm the strength and conditioning coach. Injuries are communicated to me through sports medicine.

Q. When you say communicated to you, does that mean they wouldn't show you the note, they would just tell you verbally?

A. That could be it. I don't really recall exactly, you know.

Q. Do you recall having any conversations with Meredith Cockerell about this note?

A. No.

Q. Or about limitations on Bee?

A. No.

Q. Do you agree that this accident might have been avoided if you'd asked about Bee's actual weightlifting experience?

A. No.

Q. Do you agree that this accident might have been avoided if you'd asked Bee to demonstrate the lift with just some five-pound rubber bumpers on the bar?

A. No.

MR. MAJOR: That's all the questions I have. Thank you.

MR. SMITH: I have just a couple of redirect.

REDIRECT EXAMINATION

BY MR. SMITH:

Q. Mr. Kulbis, you were asked by Attorney Major regarding whether -- the use of weight belts. Do you recall that?

A. Yes.

Q. And I think you mentioned something about it weakens the core; is that correct?

A. Yes.

Q. Can you just explain what you mean by that?

A. So if you use a weight belt all the time and you rely on that weight belt, your core can't brace for itself. Right? So typically when you, you know, are doing submaximal loads, that is when you absolutely do not want to wear a weight belt because it takes away from some core activation. It's really just those one-rep maxes when you're trying to reach weight that you've never reached before typically that you would put on a weight belt.

Q. So in this instance, when doing the 105 pounds, no weight belt was used, correct?

A. Correct.

Q. And was that because you concluded it was an introductory weight?

A. Yes.

MR. SMITH: No further questions.

MR. MAJOR: Nothing further.

THE COURT: Thank you. You're excused.

THE WITNESS: Okay. Thank you.

(Witness excused.)

THE COURT: All right. Counsel, you may call your next witness.

MR. SMITH: Your Honor, we're going to step into the hallway. I believe she's out there.

THE COURT: Okay.

MR. SMITH: Your Honor, the defense calls Natalie Kamerer.

THE CLERK: Good morning. Could you please raise your right hand.

**NATALIE KAMERER**, having been first duly sworn, testified as follows:

THE CLERK: Thank you. Please state your name and spell your last name, please.

THE WITNESS: Sure. My name is Natalie Kamerer, K-a-m-e-r-e-r.

<u>DIRECT EXAMINATION</u>

<u>BY MR. SMITH</u>:

Q. Good morning, Ms. Kamerer.

A. Good morning.

Q. Could you briefly describe your educational background?

A. Sure. I received my bachelor's degree from Elon University in 2016 in both international studies and public health with a concentration in biological aspects.

After that I received my master's degree in health science with a concentration in sports medicine from Nova Southeastern University in 2019.

Q. Can you just briefly describe for the jury the type of things you studied for your undergraduate public health degree as well as your graduate degree in health science and

sports medicine?

A. Sure. Largely in public health and biological aspects. It was a lot of exercise science courses, anatomy, anatomy labs, intro to exercise science, a bit of programming.

My master's degree, it was very similar. More advanced studies in nutrition, sports rehab principles, programming in periodized progressions for sports injuries, anatomy, anatomy labs, physiology, courses similar.

Q. Okay. And did those studies include designing and implementing weight training programs for athletes?

A. Yes, absolutely.

Q. Okay. And can you just briefly describe for the jury your employment and internships that you've held in the field of strength and conditioning?

A. Starting the summer of 2016, I interned for Dartmouth College from I guess the whole three-month summer span until about August. And then after that I interned with Davidson College in North Carolina for the entire school year, from about September, late August, until summertime when the school year concluded in about 2017. And then I went on to do my master's, so I was a graduate assistant at Nova Southeastern University from 2017 to 2019.

And then after I finished my degree there, I accepted a full-time position at Winthrop University in Rock Hill, South Carolina, where I was a full-time assistant coach

for about two years there, until about 2021, and concurrently worked at OrthoCarolina in Charlotte during that time as well.

Q. What kind of things did you do at OrthoCarolina?

A. I worked as strength and conditioning coach, both as a personal trainer but primarily in their Bridge program, which is working with athletes, typically more elite athletes and more athletic persons of the general public who had completed physical therapy but were not quite up to where they were preinjury and so it was deemed sort of unsafe for them to return to play. So we bridged the gap between where physical therapy left off and then to kind of get them back where they were preinjury.

Q. So going back to your work in college athletics as a strength and conditioning coach, can you provide the jury with a list, you know, what kind of sports you actually coached as a strength and conditioning coach?

A. Sure. So I worked with women's field hockey, women's lacrosse, men's football, men's wrestling, both men and women's soccer, women's volleyball, men and women's track and field, women's basketball, the throwers, both male and female, on the track team, among others.

Q. Okay. And do you hold any certifications as a strength and conditioning coach?

A. I do.

Q. And what certifications do you hold?

A. I'm a certified strength and conditioning specialist, so CSCS, through the NSCA. I'm also a Level 1 sports performance coach through USA Weightlifting, so USAW Level 1.

Q. Okay. And when did you get those certifications?

A. I completed the USAW in 2017 and the CSCS in 2019.

Q. And as far as the CSCS, what do you have to do to get that certified strength and conditioning specialist certification?

A. There's a rather large textbook that you largely have to memorize and you go to a -- sort of a public testing center where you're sat and monitored for about a two-and-a-half to four-hour exam where you're recorded and take a certifying exam to pass.

Q. Okay. Do you have to have any educational requirements for that?

A. You do have to have a background, now I believe they've changed it since, in a sports-related science, but you do have to have a bachelor's degree and it's sort of considered the like the gold standard that's required for you to coach at the college level. You have to have it.

Q. Is that a requirement under the NCAA rules, as far as you know?

A. I believe so.

MR. SMITH: Your Honor, I'd ask that she be

qualified as an expert in this matter.

MR. MAJOR: No objection.

THE COURT: Any objection?

MR. MAJOR: No objection.

THE COURT: Okay. Please proceed.

Q. Ms. Kamerer, you've been retained as an expert in this matter, correct?

A. Yes.

Q. And do you charge any fee for your expert services?

A. I did.

Q. And how much do you charge?

A. $225 an hour.

Q. Does the fact that you charge a fee for your expert services, does that in any way impact your -- any opinions that you would offer in this case?

A. No, not at all.

Q. And I believe when you went through your past experiences you indicated that you had about a three-month stint as the -- as an intern in the strength and conditioning program at Dartmouth?

A. That's correct.

Q. And during that three-month time period, were Mr. Kulbis and Mr. Brown at Dartmouth?

A. Yes, they were.

Q. Okay. And would that in any way impact your -- any

opinions that you're offering in this case?

A. No. I was asked to look over documents, provide an assessment, and that's what I did.

Q. And you mentioned you were asked to look over documents. What -- what documents? What did you review in preparation for preparing a report and your opinions in this matter?

A. I looked at the initial complaint, the questions answered by the defendant as well as the plaintiff, I looked at the physiotherapist's letter from Nico Berg. I also looked at the training programs provided by the other athletes that they completed.

Q. And, Ms. Kamerer, in your experience as a strength and conditioning coach, are you familiar with a lift called the hex bar dead lift?

A. I am.

Q. And we've got a bar down there. Are you familiar with that? Is that the hex bar dead lift that we have on the floor down there?

A. Very, yeah.

Q. Okay. And could you just briefly describe the proper technique for performing the hex bar dead lift?

A. Sure. So the athlete or persons would approach the hex bar, they would step into the center of it. Keeping their chest upright and shoulders back, they would sort of squat down

to the bar at a height that they could grab on to the handles next to them on either side and they would stand straight up, maintaining their posture, and then come back down in the same pathway that they stood up in.

Q. And would you provide any instructions for athletes when you were the strength and conditioning coach prior to having them do this lift?

A. Yes. Typically I would explain the goal, what the movement was, why we were doing it, some initial kind of technique cues that are commonly needed and advised on. I would typically demonstrate it a few times, answer any questions, demonstrate it again, give kind of last verbal cues, and then I would have the athletes perform it.

Q. Great. And would you be comfortable performing a demonstration of the lift for the jury today?

A. Sure.

MR. SMITH: With your Honor's permission, may we have her approach the bar?

THE COURT: Any objection to that?

MR. MAJOR: No objection.

THE COURT: Okay. Please go ahead.

Q. Ms. Kamerer, I would ask that while you do this that you just kind of explain what would you be telling the athlete on each step through the process. And --

A. Do you mind if I bring it --

Q. Yeah, you can move it however you would like.

And I will just say before you start, we have to pick you up on a microphone and there is actually a microphone right there next to you. So try to speak up because you'll be a little bit far away from it.

A. So as the athlete, typically what I would have them do is they would approach the trap bar. Obviously they would typically have tennis shoes on. They're going to stand in the middle of the trap bar or the hex bar so it's surrounding them and they are going to stand with their feet hip width apart, the weight right in the middle of the feet. So you've got pinky toe, big toe, heel, all weight evenly distributed. I'm going to keep my chest up and I'm just going to have them squat down to the bar until their hands meet their sides.

From here, I'm going to have them engage their lats, so pull their shoulders back and chest out, head nice and forward. And without jerking the bar up and making tension on their arms --

THE COURT: And, Ms. Kamerer, if you could slow down just a little bit with your speaking. Just slow it down just a little bit.

THE WITNESS: Okay.

THE COURT: Thank you.

THE WITNESS: So weight right under the hips and have the athlete keep their chest up, hands by their side, and

they're going to squat down nice and low until the hands meet the handlebars. Knees are nice and wide out far, chest up, shoulders going to be pushed back, gaze up, and they're going to stand straight up. And then they're going to lower it right back down, nice and controlled.

If they're doing multiple repetitions, they're going to need likely to reset the posture, make sure everything's nice and tight again, and stand straight up.

Q. Okay. Thank you. That's great. You can return to the box.

So could you describe for the jury generally what is the purpose of the hex bar dead lift from a strength and conditioning perspective?

A. It is a -- by our governing body, it's a pretty staple core movement in strengthening the lower body and building overall resilience, strength, possibly power of the posterior chain.

Q. And, again, in your experience, would you consider this to be an introductory-type lift or more of an advanced lift?

A. Introductory.

Q. And why is that?

A. It's a pretty noncomplex movement. It's generally a more natural position for an athlete to get into than a conventional dead lift or other variations of a dead lift

because it mimics more like sitting in a chair, things they've done more regularly, a little more often, and it doesn't require a ton of cueing, where you might have cueing overload for an athlete if you give them a lot of direction.

Q. Okay. And, in your opinion, is the hex bar dead lift, is that an appropriate lift for a collegiate field hockey player?

A. Yes.

Q. And why is that?

A. Our goal as a strength and conditioning coach is to prepare the athlete for their sport. So our goal is to give them exercises that are going to make them more resilient and hopefully kind of mimic some things that they'll experience in terms of strain, in terms of muscle movement, in force that they'll experience on their field or court or wherever their athletics are.

So for a field hockey athlete, they are bent over, they are running, they are bracing their core, they're cutting, using agility, they're changing direction quickly. They're also rotating their trunk, having flexion-extension rotation, and they're bent over. So that, you know, we need to provide something that's appropriate for those movements. Trap bar dead lift also requires them to brace their core and exert force through their lower body. So it's a pretty comparable movement.

Q. And I know you just mentioned there's a trap bar dead lift. Is there any difference between a trap bar dead lift and a hex bar dead lift?

A. In terms of movement, no.

Q. Okay. What's the difference?

A. The shape of the bar. A trap bar is shaped like a trapezoid. A hex bar is shaped like a hexagon.

Q. Do you have an understanding of how much weight Ms. Hollyer claims was on the bar when she was doing the lift on September 19th, 2017?

A. I do.

Q. And what's your understanding?

A. I believe she used 105 pounds.

Q. And do you have an opinion on whether 105 pounds was a reasonable starting weight for Ms. Hollyer?

A. I do.

Q. And what is that opinion?

A. From my opinion, it's well within an appropriate range to give someone. The NSCA says that an inter -- or a novice or beginner lift for the dead lift of someone of comparable size should use about 90 to 135 pounds in a dead lift. So 105 pounds as a beginning weight to start off your sets and your buildup with is well within that range.

Q. Okay. And in reaching your opinion, did you review any scholarly articles or do any research to support that

opinion or to -- or educate yourself more on the position?

A. I did.

Q. And what was that?

A. There's a -- from referencing the NSCA's journals and their general kind of guideline book, also an article by Dr. Hewit, a PhD student describing understanding deceleration and acceleration.

Q. Okay. And what -- what did you learn from reviewing Dr. Hewit's article?

A. Essentially the weight that an athlete carries or a person carries is going to be amplified in their sport. So you can expect that when an athlete who participates in agility, cutting, deceleration, acceleration, quickly and abruptly is going to experience forces on their muscles, their joints, their tendons and ligaments, two to five times that of their own body weight, just because, I mean, it's physics; you're going to accelerate to change direction, you have to exert force greater than that force to create the acceleration.

So 105 pounds at the body weight of my understanding should be well within that range, you know, of what her ability is if she's cleared to play field hockey.

Q. And what is your understanding of Ms. Hollyer's body weight at the time?

A. I understand she was 125 pounds.

Q. And do you know whether Ms. Hollyer had any prior

experience with weight training prior to doing the hex bar dead lift in September 2017?

A. I believe she stated she did not have any experience.

Q. Would that have any impact on your opinion regarding the appropriateness of the weight on the bar?

A. No. Again, that guideline states beginner or novice athlete should aim for 90 to 135 pounds, so 105 is still well within that range and she was cleared to participate and didn't have any restrictions on the lower body. So, again, I think no influence there.

Q. And I believe you indicated you reviewed some records of other athletes who were performing the lift on the same date; is that correct?

A. Yes.

Q. And do you recall what weight all of those athletes started at?

A. I believe they also started at 105 pounds.

Q. And based on your review of the records and what you've seen in this case, do you have any opinion on whether Ms. Hollyer was properly supervised or instructed when she did the lift on September -- in September 2017?

A. I do.

Q. And what is that opinion?

A. I believe she was absolutely adequately supervised.

Q. And what's the basis for that opinion?

A. To my understanding, Mr. Kulbis has a bachelor's degree in exercise science as well as a master's degree in human health and performance. Also, again, our governing body has certain determinations of ratios for what's appropriate strengthening -- strength coach-to-athlete supervision. I believe that's one coach to 20 athletes, particularly for those who are novice or beginner. And I believe he -- she actually noted that he pulled her aside to provide one-on-one instruction. So that's well within that range.

Q. Okay. And would be -- would providing a demonstration also be an appropriate thing for a strength and conditioning coach to do?

A. Yes, absolutely.

Q. And providing instruction such as big chest, shoulders back, would that be appropriate instruction?

A. Absolutely.

Q. And Ms. Hollyer's testified that while lowering the bar, Mr. Kulbis instructed her to squat lower. Is that an instruction or a cue that you're familiar with?

A. Yes.

Q. Is it an instruction or a cue that you use?

A. All the time.

Q. And what does it mean when you use that cue, squat lower?

A.   Typically when I use that cue, it's because the athlete is lowering the bar and leaning too far forward and they're making it more of a lower back kind of exacerbating or straining exercise versus using their lower body and keeping the chest upright.

So typically when we're saying I want you to squat lower, it means keep your chest up, drop your hips, and use your legs in order to protect the low back.

Q.   In your experience as a strength and conditioning coach, have you ever been aware of an athlete who gets injured while lifting weights even though they follow all the proper protocols and the weight on the bar is appropriate?

A.   Yes.

Q.   And can you explain to the jury how that happens in that situation?

A.   There are a lot of unknowns that we just can't control for and I think there is just a certain risk level, even though weightlifting has some of the lowest -- Olympic lifting, power lifting, has some of the lowest rates of injury across all sports, there is just an inherent risk there.

MR. SMITH:  Can we put up Exhibit Number 30, please.

Q.   So I'm showing you a document.  This is a document that you reviewed in your preparation for preparing your expert opinions in this matter?

A.   Yes.

Q.    And I'll represent to you that it's a letter from a physical therapist, Nico Berg.

When you read this letter, did you have any understanding or what was your understanding of any limitations that were being placed on Ms. Hollyer regarding lifting?

A.    To my understanding and as I would read this, I would interpret this as she is not to do anything overhead or that would be upper body lifting overhead, but she is cleared to do lower body exercises.

Q.    And if you were the strength and conditioning coach at this time and you received this note, would you have instructed Ms. Hollyer not to do the hex bar dead lift?

A.    No.

Q.    You felt it was a safe and appropriate lift even with these restrictions?

A.    Yes, absolutely.

MR. SMITH:  I have no further questions.

THE COURT:  Attorney Major.

CROSS-EXAMINATION

BY MR. MAJOR:

Q.    Good morning, Ms. Kamerer.  My name's Jason Major. I represent Khia Hollyer.  Nice to meet you.

Earlier in your testimony you mentioned that you were actually an intern at Dartmouth.

A.    Uh-huh.

Q. And so you do know Mr. Brown and Mark Kulbis?

A. I do.

Q. And did you study with them or work under them?

A. I was an intern under Spencer Brown.

Q. All right. Were you guys friendly?

A. I worked with a variety of coaches there. I would -- haven't really had much contact since then.

Q. Okay. I read your report. In part of it you mentioned inherent risks of sports and physical activity. Do you agree that's one reason that coaches are important?

A. I would agree.

Q. Because a sports team wouldn't want to just set their athletes loose in a room full of weights and say, good luck; right?

A. I would agree.

Q. The idea of using a coach is to make sure that the athletes use equipment like that, weights and machines, properly, right?

A. Uh-huh.

Q. And you want them to use it properly because you want to maximize the gains that they get from using that equipment?

A. That's correct.

Q. And you also want to keep them safe?

A. Absolutely.

Q. All right. Fair to say that when an athlete signs up to work with a coach that that athlete's putting a lot of trust into that coach?

A. I would agree.

Q. Okay. They look at the coach as the expert?

A. (Nods head.)

Q. Is that a yes?

A. Yes. Yes, I would hope so. Yes.

Q. Looking to the coach to keep them safe?

A. That's correct.

Q. Just a couple minutes ago you were talking about supervision. In your report you talked a lot about ratio of students to coaches.

A. (Nods head.)

Q. Yes?

A. Yes. Sorry.

Q. We're not really here to talk about the ratio, though. We're talking about the supervision individually of Khia Hollyer, right?

A. Yes.

Q. And do you agree that coaching should be individualized to a degree?

A. To a degree, when appropriate, yes.

Q. All right. It's more likely that you'll run into problems with safety if you just apply a one-size-fits-all

approach to everyone?

A.   We certainly have standards that are put in place for that reason also, to -- from our governing body, the NSCA, to say, hey, this is what we're saying our expertise is and this is a safe metric.  So we typically start there and then provide our coaching expertise, which is why you see the progression of weights with the other athletes, because then it's up to the coach to make that judgment call.

Q.   All right.  But you would agree that at some point the coach needs to look at each individual athlete and judge what they're doing and give them individualized training?

A.   Yes.

Q.   You mentioned in your report and in your testimony that you were certified by the NSCA?

A.   That's correct.

Q.   That's the National Strength and Conditioning Association?

A.   That's correct.

Q.   Would you agree it's a good idea or, actually, would you agree that the guidelines from NSCA recommend that coaches and trainers have athletes fill out a medical questionnaire prior to starting training?

A.   I am not familiar with that, but I -- if it's in there, then yes.

Q.   Does that make sense?

A.   Yeah, sure.

Q.   And a coach would want to know, wouldn't they, if the individual athlete had some sort of injury or restriction?

A.   Yes, should it pertain or affect how their training program would be, yes.

Q.   All right.  And do you think it's also a good idea for a coach to just do some basic inquiry with each individual athlete to make sure they understand what that athlete's experience is with weightlifting in general or with a particular lift?

A.   It's never a bad idea.  I think typically we look at athletic training to provide injury reports or, of course, if there's an athlete who comes in on the first day, the beginning of weight training, and they have a visible -- you know, a knee brace, a wrist brace, something visible, well, of course that would prompt a how did you get that, what's going on with that, let's -- you know, can you tell me a bit more about that.

But typically it's the athlete who presents initially if there's something that would affect their training or a parent or a former coach or a sports coach would typically indicate.

Q.   Coming at it a different way, what's the downside to having a coach each weightlifting meeting just ask the athletes -- you know, or the first meeting, obviously -- what's your experience?  Is there a downside to that?

A. To asking about injury?

Q. No, to asking about what the person's experience is.

A. I would not imagine there being much of a downside, no.

Q. It wouldn't take that much time?

A. No, it's unlikely.

Q. All right. And the same for injuries?

A. You could say the same.

Q. In terms of instructing an athlete -- you did a great job showing us the form.

Imagine your coach is standing there while you're showing the form. Do you think it would be a good idea for the coach to inform the athlete about what the risk factors are for doing a particular lift?

A. It would not be a bad idea, but that is not typically within practice. I think, again, we accept that there is an inherent risk there and that typically is not done prior to every time an athlete changes to a new piece of equipment around the room.

Q. All right. So there's -- I'm trying to understand. Is it like a cost-benefit thing where you don't tell the athlete, hey, look, if you raise your hips or if you round your back, you're going to hurt your lower back?

A. I see what you're saying.

So typically that would be part of cueing. We say,

hey, start with your knees out wide, push your knees out as you stand because we want to protect the knees. Typically that might be part of cueing, but it's not typically elaborated on to a further degree than part of cueing, of saying we don't want to see this, we do want to see this.

Q. Okay. So you don't think it's appropriate to inform an athlete, you know, here's the cue, but this is why I'm giving it to you?

A. I don't think it's inappropriate. I think that that's typically where it stops is typically just that of, hey, keep the shoulders up, chest back, flat back, we don't want to stress out the low back.

Q. And I know you have an understanding that Mr. Kulbis demonstrated the form for the hex bar dead lift to the athletes on the day that the incident happened with Khia Hollyer, correct?

A. I believe so, yes.

Q. Okay. But you weren't there?

A. No.

Q. So you don't know exactly what he did?

A. No, that would be correct.

Q. All right. And would you agree that for any kind of dead lift squat, hex bar dead lift, that one of the primary potential mechanisms of injury is to that lower back if you roll your shoulders forward, round your back; that's how you're

going to hurt your lower back, right?

A. Yeah. Assuming they have poor technique in those areas, that is a risk factor.

MR. MAJOR: Okay. And could we bring up Exhibit 30 again?

Q. All right. So this is the note from Khia Hollyer's physical therapist, Nico Berg. I believe you saw this as part of your analysis of this case.

A. I did.

Q. All right. I think you testified that you didn't view the hex bar dead lift as a heavy upper body loading?

A. That's correct.

Q. All right. I'm tempted to have you come down and have you show the form again. Let's see if we can just do this with you on the stand.

When you take that weight up, what are you taking it up with?

A. My legs.

Q. How does it get to your legs?

A. I'm -- can you restate the question?

Q. How does the weight get transferred to your legs?

A. Creating tension through your body.

Q. It's not bolted to your knees or your hips, though?

A. Oh, I see what you're saying. No, you're holding it in your hands.

Q. Okay. So the weight travels weight up your arms, correct --

A. Correct.

Q. -- to your shoulders?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Okay. And then across your shoulders to your spine?

A. That's correct.

Q. All right. Down your spine to your lumbar area?

A. That's correct.

Q. And then to your hips?

A. Uh-huh.

Q. And down into your legs?

A. Yes.

Q. So your upper body is involved to some degree?

A. It is in bracing, but that would be sort of comparable to prescribing back squats when you are trying to designate an exercise to train your core. I mean, you could say everything is always connected through the low body. Just like we don't want to stress out your jaw, but if you do a sit-up or a crunch, you're straining your neck, which is straining your jaw, which is -- I mean, you could make the case that everything is connected all the time, but that doesn't mean that you are programming it for the purpose of --

Q. I understand what you're saying.

A. -- you know.

Q. You're trying to work out a particular set of muscle groups.

A. That's correct.

Q. That's what the exercise is designed to do.

A. Uh-huh.

Q. But you get to that exercise through the shoulders, upper back, to the lower back; that's just the way it has to work.

A. Sure. The movement is -- the load is carried by the legs. They're simply bracing in the upper body.

Q. All right. And so your opinion is that the fact that Khia Hollyer had restrictions on heavy upper body loading has no -- no factor at all in terms of a risk potential for injury for her?

A. No, I -- I think, again, it's a -- it's designated as a lower body exercise. The weight is surrounding her rather than dangling in front of her with a conventional trap bar. She's standing with her legs. She's simply providing postural support. The load is being carried and lowered and maneuvered by the lower body.

Q. Okay. If she's got weakness or pain in her upper body, shoulders or low neck, it's more likely that she's going to drop those shoulders or round her upper back?

A.   She may or may not, depending on her natural inclination, depending on her ability of just general body control and core strength, strength altogether.

Q.   You mentioned the fact that you looked at a bunch of books.  You obviously looked at a ton of books, I'm sure, in your studies about weightlifting and things like that --

A.   That's correct.

Q.   -- training.

Okay.  Would you agree that virtually all of those books recommend that an athlete should be able to demonstrate the proper form for a lift before any significant amount of weight is added to the bar?

A.   I would agree that it's advisable.

Q.   Okay.  And do you know whether or not Ms. Hollyer was required to show proper form before an extra 50 pounds was put on that bar?

A.   Before -- like can you -- I'm sorry.  Can you restate the question?

Q.   Do you know if Ms. Hollyer was required to show that she could do the proper form with the hex bar before those two green plates were put on it?

A.   If she had been required to perform the weight without the weights on it and it was sitting flush to the floor, she would have had to squat lower, which would have kind of compromised the form of the trap bar dead lift and would

have likely had made her round her back even lower to get to that point. So I don't believe she was advised to do that and probably in good practice.

Q. Yup. That would be good practice. And that's why they make little things, I think they call them pizza pans or something like that, five-pound rubber or plastic weights. They're designed specifically to get a dead lift bar or hex lift bar off the ground, right?

A. Sure. There are smaller weights.

Q. Okay. That could have been done?

A. I agree it could have, but, you know, again, we're seeing -- we have a range of 90 to 135 pounds. If she was at 105, that's well within that novice range. And, again, we want to prepare the athlete for sports, so by not giving them a little bit of a challenge or by starting them at a certain point, you could be putting them at a greater detriment later by not preparing them for their sport and having that progression there that's appropriate.

Q. You think the progression is important, though?

A. I agree, yes.

Q. In terms of that range, what was the organization you said that set up the 90 to 135? Is that also --

A. The NSCA.

Q. Okay. All right. Would you agree that even before you get to that starting weight, the athlete really should be

able to master the form?

A. I would agree that that's certainly ideal.

Q. Okay. On direct you -- you talked about the directive that Mr. Kulbis gave to Ms. Hollyer to squat lower.

A. Uh-huh.

Q. Do you know for a fact that he told her to squat lower, because looking at your report it says to bend lower. Do you know which of those terms he might have used?

A. I'm not certainly clear. I think I read squat lower on one of the reports. I don't recall. I may have used bend lower. Squat lower is -- to me is a more typical cue that we would use, so ...

Q. All right. If she was told just to go lower or to bend lower, that's a little bit more vague, isn't it?

A. The assumption would be assuming we are keeping good form and he's advised on good form, the bend would imply bend your knees lower.

Q. You'd hope so.

A. Sure, if that was on par with the cueing to keep the torso upright. He would have not cued to bend the torso further lower.

Q. But you agree if that instruction isn't squat lower, something, a little variation of that, and this is the very first time she's ever touched that bar, that increases the risk that she might do it wrong, she might drop her shoulders

instead of squatting --

A. Anytime -- I would say anytime an athlete has a certain understanding that might not be what was implied or intentioned by the coach, there's going to be some misunderstanding there.

Q. And with it, the potential for injury?

A. Yes, that would be correct.

MR. MAJOR: Okay. Thank you. I have no further questions.

MR. SMITH: No further questions, your Honor.

THE COURT: Okay. Thank you. You can be excused.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: Is now a good time for us to take a break?

MR. SMITH: Probably is. We need to make sure the witness is here and available. I believe she is, but I can go out and take a look.

THE COURT: And, Liza, you'd probably like a break at this time.

Okay. We're going to take a quick break. Why don't we say -- do you think ten minutes, Liza, is -- we're going to take a ten-minute break and come back and keep things moving.

THE CLERK: All rise.

(Jury excused.)

THE COURT: All right. Do you need anything?

MR. SMITH: I don't believe so.

THE COURT: Okay.

(Recess taken from 11:16 a.m. until 11:24 a.m.)

THE COURT: Before we bring the jury in, can we talk very briefly about witness timing.

So we have Cockerell now and it's only 11:24. Is there any chance at all your expert can be --

MR. WARD: I'm working on it right now.

THE COURT: Thank you.

MR. CHABOT: Your Honor, I just have to step out for half a second.

THE COURT: Please go right ahead.

I don't want them to get upset that we brought them in at 10:00 to have them sit around.

                    WITH THE JURY PRESENT

THE COURT: Before we begin, counsel, I just want to remind the jury again that when you retire into the jury deliberation room, I don't want you to be discussing any factors of the case, any of the evidence that you've heard. If you want to have, you know, light conversation about other things, that's absolutely fine, but no discussing the evidence or the case itself until you go into there -- in there to deliberate.

MR. SMITH: Your Honor, the defense calls Meredith

Cockerell.

THE CLERK:  Just step around to the witness box and raise your right hand.

**MEREDITH COCKERELL,** having been first duly sworn, testified as follows:

THE CLERK:  Thank you.  You can be seated.

Please state your name and spell your last name for the record.

THE WITNESS:  My name is Meredith Cockerell, C-o-c-k-e-r-e-l-l.

DIRECT EXAMINATION

BY MR. SMITH:

Q.  Good morning, Ms. Cockerell.

A.  Good morning.

Q.  Could you please provide the jury with a brief description of your educational background?

A.  Yes.  I went to Southwestern University and received a Bachelor of Arts in kinesiology with an emphasis in athletic training.  I graduated in 2006.

And then I went to Michigan State University and received a Bachelor of Science -- sorry -- a Master's of Science in athletic training in 2008.

Q.  Can you just please provide a brief description of your employment history since graduating from college?

A.  Yes.  So I was a graduate assistant at Michigan

State where I worked in a high school at -- Everett High School. I was their primary athletic trainer there. I also worked on campus at Michigan State in their athletic training facility. I did that for two years.

After graduating there, I went to St. Mary's University, which is a Division II school in San Antonio, Texas. I worked there for approximately two and a half years before going to Dartmouth. And I worked at Dartmouth as an athletic trainer from January of 2011 to January of 2019 and then I moved back to San Antonio and was an athletic trainer at Lackland Air Force base in their basic training facility. And about a year ago I transitioned into a research coordinator at Lackland Air Force base as well.

Q. And when you were at St. Mary's, were you an athletic trainer there as well?

A. Yes, I was.

Q. And do you hold any certifications relating to athletic training?

A. Yes. I have a license in the state of Texas to practice athletic training. With that license, you have to hold a national certification with our board of certifications. So I'm nationally certified as an athletic trainer as well as a license to practice the in state of Texas.

THE COURT: I'm sorry, Ms. Cockerell. Could you please try to slow down a little?

THE WITNESS:  Yes.  I'm sorry.

THE COURT:  Because Liza is trying to take down --

THE WITNESS:  I'm so sorry.

THE COURT:  -- what you're saying, and it's a difficult thing to do.

THE WITNESS:  Yes, ma'am.

THE COURT:  Thank you.

Q.    And in September of 2017, were you with Dartmouth College?

A.    Yes, I was.

Q.    And were you a certified athletic trainer in New Hampshire at that time?

A.    Yes.  I held a license in the state of New Hampshire to practice athletic training.

Q.    Okay.  So can you just briefly describe for the jury what kind of -- what the responsibilities of an athletic trainer in a college situation are?

A.    Yes.  So as an athletic trainer, my education involved -- we have six domains that we are certified in:  It's emergency management, rehabilitation, injury prevention, evaluation diagnosis, professionalism, and note-taking.  Those are the domains that we are accredited in.

And for a college athletic trainer, what happens is you're really kind of responsible for the team that you are with and you provide prevention strategies, you help any -- any

person who gets injured. You are there at every practice, you travel to all of their games as well, just in case somebody gets injured there at the game. You're pretty much there -- you're really available to that team 24/7 for any of their needs.

Q. And when you were at Dartmouth College in September 2017, what sports were you the athletic trainer for?

A. I was the athletic trainer for the field hockey team. I also was the athletic trainer for the track and field team, primarily the sprinters, jumpers, and throwers.

Q. And while at Dartmouth College, were your athletic trainer responsibilities similar to those that you've just generally described that an athletic trainer does?

A. Yes, they were.

Q. Okay. So you spent a lot of time with the team; is that correct?

A. Yes, I did.

Q. And are you familiar with the plaintiff, Khia Hollyer?

A. Yes, I am.

Q. And how do you know Ms. Hollyer?

A. I knew her because she was a member of the field hockey team and I met her when she was a freshman when she -- she started playing field hockey.

Q. Okay. And when Ms. Hollyer started as a freshman

during the preseason, did you have any interactions with her mother?

A. Yes, I did.

Q. And can you just please describe that for the jury?

A. Yes. I first met her mom at the meeting that we held. The coaches held a meeting for all of the parents to kind of just go over some generalized things that the coach wanted to -- to talk about.

I also was present at that meeting to just kind of introduce myself and just kind of let people know who I was.

I also spoke with her mom on the field. She came to one of the practices and I spoke with her and she gave me some documentation at that time.

Q. And if we could put up Exhibit Number 30.

So you mentioned some documentation that Khia's mother gave you. Is this a -- is this the documentation that you're referring to?

A. Yes, it is.

Q. And what do you understand this to be?

A. This was a letter that her mom gave to me from her physical therapist that she had been seeing that summer. And here it just -- it explains that she had some limitations in overhead movements and heavy upper body lifting.

Q. Okay. And do you know what caused Ms. Hollyer to have these limitations?

A. I believe it was from a car accident and a whiplash injury she sustained before she got to Dartmouth.

Q. And where did you understand those -- the whiplash injury, what part of her body was affected?

A. Her neck.

Q. And based on this note, what did you understand her limitations were?

A. Her limitations would be in the weight room and it would involve movements that required upper body lifting and overhead -- heavy overhead movements.

Q. And did you interpret this to be any limitation on doing lower body lifts?

A. No, I did not.

Q. What did you do with this note?

A. So I gave a copy of this to Mark Kulbis, the strength coach. We also had a discussion about that. He was responsible for doing all of their lifts and so I had any -- anybody who had any restrictions, we would have communication about restrictions that that athlete had.

So I gave the note to -- I gave him a copy of this note, I discussed what type of limitations that she was under, and then it was given to our office manager to scan to be a part of her electronic medical record.

Q. And when you discussed the limitations with Mr. Kulbis, what -- what limitations would you have told him?

A. I would have told him that she would be limited in her heavy upper body movements and anything over her -- overhead.

Q. And according to this note, she was cleared to participate in field hockey training without difficulty; is that correct?

A. Correct.

Q. Are you familiar with a lift called the hex bar dead lift?

A. I am, yes.

Q. And there's a bar in front of you. Is that your understanding that that's a hex bar?

A. Yes.

Q. Okay. Can you just generally describe your understanding of the lift?

A. Correct. So you stand in the middle of the hex bar and the weights are obviously on the side there. Then you grip the handles and in a flat back position, you stand up and then you place it back down on the ground.

Q. Is this a lift that you've ever performed?

A. It is, yes.

Q. Okay. And as an athletic trainer after reading the note that we have on the screen, Exhibit 30, from Mr. Berg, would you have been comfortable allowing Ms. Hollyer to perform the hex bar dead lift?

A.   Yes, I would.

Q.   And why is that?

A.   Because it is primarily a lower body lift.  You use your legs to stand up and move the weight and it does not require overhead movement and minimal -- it really doesn't require any overhead movements.

Q.   At some point did you become aware that Ms. Hollyer was experiencing lower back pain after a weightlifting session?

A.   Yes, I was.

Q.   What do you recall about that?

A.   Per my documentation, I remember her having pain with movement.  She had pain moving forward and backwards and she had some pain, some sciatic pain, down her leg from some muscle tightness and I remember that happening after the lift.

Q.   Okay.  Did you continue to see Ms. Hollyer for a week or so after the lift?

A.   Yes, I did.

Q.   And what is your general understanding of her condition during that week?

A.   That she had initially had the pain with movement and that she had some of that pain, that muscle tightness and that pain down her leg.  However, it was getting better over that week that I was seeing her.

Q.   And you mentioned before that as per your notes, I think was the words you used --

A.    Yes.

Q.    Do you keep notes as a member of the training staff?

A.    Yes, I do.

Q.    Okay.  I'd ask that we put up Exhibit O and go to page 12.

And I'd just ask you, are these a copy of your notes?  It's a two-page document.

A.    Yes, they are.

Q.    And let's just show the second page to make sure it's complete.

When did you leave Dartmouth College?

A.    I left in January in 2019.

Q.    And why did you leave?

A.    I left because I had a different job opportunity and I wanted to move closer to home.

Q.    Did you continue to be the athletic trainer for the Dartmouth College field hockey team up until the time you left to move back home?

A.    Yes, I did.

Q.    And during that time, did you continue to communicate with Ms. Hollyer about her injury?

A.    Yes, I did.

Q.    And how would you communicate?

A.    I would communicate primarily through email or it was in person if she was on campus.  Then she would come in for

treatment and rehab throughout that. And then if she was not on campus, then we would communicate through email.

Q. And can you just give me the general substance of those communications, what you guys were communicating for -- back and forth about up through January 2019?

A. The communication was how she was doing, how -- how her back was feeling. A lot of it was progressing back into activity while she was returning to running, returning to more activity, and it was checking in to see how that was going, if she was experiencing any pain. And overall it was just a communication of how that was going.

Q. And overall, how -- how did -- based on those communications, how was Ms. Hollyer doing? How was her mood?

A. From all that I could tell from the email, I know sometimes it's hard to kind of read the tone of emails, but they seemed very upbeat. It seemed that she was able to participate in more activities and she was able to do more running and continue kind of progressing back into that activity.

If there was any time that she described pain or felt that, you know, things were not going well, it was, you know, let's -- let's go ahead and take that back, let's not do that, give it a few days, see how we're feeling.

So overall they seemed very upbeat and that she was getting back into some stuff fairly well.

Q. Did you continue to have access to her outside medical records in your position as athletic trainer?

A. I had to request those medical records, so anytime that she went to anyplace outside of the Dartmouth Hitchcock medical facility, I would have to request those documentations so that we could review those. But that was standard practice for us in the athletic training room was any -- anytime they saw an outside provider for an injury that then would involve their playing status, we would request those -- that information. So I did request that to review as I needed to.

Q. Okay. And when you requested it, did you receive most of it?

A. I believe so, right? I believe I received most of it. Any documentation I did receive then was scanned into her electronic medical record there at Dartmouth.

Q. And if you received it, would you review it?

A. Yes, I would.

Q. Okay. And based on your review of those outside records that you did receive and your communications with Ms. Hollyer, what was your understanding of her condition up until the time that you left Dartmouth College in January 2019?

A. Per my understanding of it and my remembrance of that documentation is that she continued to progress and that she was continuing to get back into activity with minimal issues and that we continued following the direction of her

outside medical providers.

Q. Ms. Hollyer has provided some testimony during her direct examination indicating that after that September 19th, 2017, lift, she was at a practice where she engaged in a tackling drill and she had to crawl off the field.

First of all, can you -- are you familiar with field hockey?

A. Enough, yes.

Q. Do you -- can you tell us what a tackling drill is?

A. So to my understanding, I do not play field hockey, however, a tackling drill involves basically taking the ball away from somebody.

So if you have your stick and your ball and you're -- you are -- you have it that the other person is supposed -- is trying to take the ball away from you, so that's either jabbing their stick or it's placing their stick flat on the ground and that's -- that's -- it's -- it's a defensive drill to try to get the ball away from that person.

Field hockey is a noncontact sport, so you cannot bump people, you can't tackle them to the ground, those type things. So it's really -- it's a technique to get the ball away from the other player.

Q. Okay. And during your time at Dartmouth College, did you ever observe Ms. Hollyer crawl off of the field?

A. Not that I can recall.

Q. Okay. Is that something you would likely have observed if it had occurred?

A. Yes. I was at every practice. If for some reason I wasn't, if I did not see that happen, the coaches that were there would also -- would absolutely let me know that as well.

Q. Have any of the coaches ever reported to you that Ms. Hollyer had to crawl off the field?

A. No, they did not.

Q. How about any of the players, did they report that to you?

A. No, they did not.

MR. SMITH: I have no further questions.

CROSS-EXAMINATION

BY MR. MAJOR:

Q. Good morning, Ms. Cockerell. Nice to meet you in person.

A. Yes, nice to meet you.

MR. MAJOR: Stacey, can we bring up Exhibit 30 again?

Q. Ms. Cockerell, this is the note from Nico Berg?

A. Correct.

Q. I think your testimony was that you -- well, why don't you repeat it. Did you provide this note to Mark Kulbis or a summary of it?

A. I remember -- I mean, what I remember from that time

is I provided him a copy of this and we discussed it as well.

Q. Okay. And just looking at the note, I understand your opinion is that it restricts overhead movements or heavy upper body loading. And would that include press?

A. It could. It says heavy upper body. So if it was a lighter load, that's -- I think that would not qualify, but it does say -- say heavy upper body type lifting.

Q. Doesn't it say overhead movements?

A. It does, yes.

MR. MAJOR: Okay. Stacey, can we have Defendant's Exhibit A?

Bear with us.

Stacey, if you can scroll down to September 19th.

THE PARALEGAL: Screen's off again. To which date?

MR. MAJOR: September 19th.

Thank you.

Q. Ms. Cockerell, you understand what this document is?

A. It looks like it was her training program. I -- I did not -- this is not my program, so I -- it looks like her -- her training program.

Q. Okay. You're not familiar with TeamBuildr?

A. I've -- I have not used it personally, no.

Q. All right. Are you familiar with what the athletic teams do with it?

A. Yes.

Q. All right. And my understanding is that the coach will fill out these grids --

A. Uh-huh.

Q. -- with exercises and then the athlete records what they did. Make sense?

A. Yes.

Q. Okay. So for September 19th, 2017, just going down, first there's a basic questionnaire. Do you know what that asks?

A. I do not, no.

Q. Okay. Going down, the third exercise, seated DB shoulder press, do you know what that is?

A. Yes, I do.

Q. And what is it?

A. It's a dumbbell shoulder press.

Q. How does the motion work?

A. It goes like this.

Q. Straight up?

A. Yes.

Q. Would that be an overhead lift?

A. That is overhead, yes.

Q. All right. Given that Coach Kulbis had her doing overhead lifts like that, I guess I'm having a hard time understanding. If you told him or you talked to him about that note from Nico Berg, why is he having her do overhead presses?

A. I can't answer that. I did not give her this exercise.

Q. All right. Okay. Would you agree that you're not qualified to say whether 105 pounds is a reasonable weight?

A. I am not a strength coach.

MR. MAJOR: All right. And looking at Nico Berg's note again -- if you could put exhibit 30 back up?

THE PARALEGAL: Which one?

MR. MAJOR: Exhibit 30.

Thank you.

Q. A lot of discussion today about upper body and what that means in the context of a hex bar dead lift. I think we all agree at this point that hex bar dead lift is targeting the lower body. In other words, when you do that exercise, what you're trying to do is work out your legs and your lumbar spine and the lower body. That weight doesn't get to the lower body through the lower body, though, does it?

A. I don't understand your question.

Q. No one has so far, the first time at least.

What takes up the weight of that bar?

A. You are holding the bar.

Q. Exactly. And then from your hands, where does the weight go?

A. I really can't answer that question. You're holding the bar and you're standing up to target your lower body.

That's all I can really describe for that.

Q. You're using the weight against your lower body; that's the purpose of the exercise.

A. You hold it and you stand it up to -- to strengthen your lower body.

Q. Right. So you're trying put weight on your lower body?

A. Correct.

Q. Okay. So the weight has to get from your hands to your lower body, agreed?

A. Yes.

Q. All right. And it does that by being transmitted up your arms to your shoulders, correct?

A. I really don't know the mechanics of how that works, to be very honest. So you are holding it and you're standing up. That's the only explanation I think I can give for that.

Q. You're a physical trainer and this is --

A. I'm not a physical trainer. I'm an athletic trainer.

Q. Sorry. And this seems like common sense to me.

It goes up your shoulders?

MR. SMITH: Well, objection, your Honor.

Q. Would you agree it goes up to your shoulders and then across to your spine?

A. I agree you're holding it. The mechanics of how it

gets down to your legs, I'm not a biomechanic. I can't answer exactly how that happens.

Q. All right. Thank you.

Do you agree that it wasn't infrequent at some of the practices you attended for you to -- I mean, assuming no one was injured or needed your services, that you might be off on one corner of the field kicking balls or hitting balls?

A. That's correct, yes.

MR. MAJOR: Okay. All right. I have no further questions. Thank you.

THE COURT: Okay. Redirect?

MR. SMITH: A quick question.

REDIRECT EXAMINATION

BY MR. SMITH:

Q. So, Ms. Cockerell, you were asked some questions about I believe it was the seated dumbbell shoulder press by Attorney Major.

A. Yes.

Q. And you agreed that that would be an overhead lift, correct?

A. Yes.

Q. Do you know whether Ms. Hollyer sustained any injury as a result of doing that lift?

A. Not that I am aware of.

Q. She never reported anything to you?

A.    Correct.

MR. SMITH:  Thank you.  No further questions.

MR. MAJOR:  Nothing from me, your Honor.

THE COURT:  All right.  You may be excused.  Thank you.

(Witness excused.)

THE COURT:  Okay.  So I just want to confirm with plaintiff's counsel the next witness will be ready at 1:15?

MR. WARD:  That's correct, your Honor.

THE COURT:  Okay.  So I'm going to excuse you for lunch.  You get a little bit of extra time now because we thought this would go a little bit longer in the morning.  It's difficult to predict how long witnesses are going to take.

The next witness will start at 1:15, which is earlier than the two o'clock start we thought we would have, so we might not need to stay as late tonight.  So I look at this as good news.

So I'll expect everybody to be back and ready to start with the witness at 1:15.  All right?

THE CLERK:  All rise.

(Jury excused.)

MR. CHABOT:  One small thing, and I don't think we need a record.

Mr. Brown has a longstanding prior commitment tomorrow and is not going to be with us.  We would just ask,

you know, for some, you know, brief and neutral explanation from the Court concerning his absence and --

THE COURT:  Any objection to that?

MR. MAJOR:  No.

THE COURT:  No.  Okay.  Yes.  If you have something in particular you would like me to say --

MR. CHABOT:  We'll get you a proposal.

THE COURT:  -- give it to me.

Jury instructions.  We will have jury instructions to you before the afternoon starts.  So look them over, you know, overnight.  I know you're busy here this afternoon.  So look at them overnight and we will plan to deal with any issues with them early tomorrow morning.

What do you think?  The first witness is starting at 9:00, right, tomorrow?

MR. SMITH:  That's correct.

THE COURT:  Okay.  8:15.  8:15 work?  Does everybody think 8:15 will be sufficient time?  I don't want to cut you short.  I'm willing to come in whenever you want.  You haven't seen them yet, but --

MR. SMITH:  I would assume -- there wasn't a lot of difference, I think, between our versions.

THE COURT:  Right.  The Court's version is a little different, as you know, but it won't -- it won't be full of surprises.

Okay. We'll plan on 8:15 for tomorrow morning to go over those. We'll get them to you before you start with the afternoon witness.

MR. SMITH: Okay.

THE COURT: Great.

THE CLERK: All rise.

(Lunch recess taken at 11:52 a.m.)

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 10/12/22          */s/  Liza W. Dubois*
                             LIZA W. DUBOIS, RMR, CRR